UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

|                                   |   |                      |
|-----------------------------------|---|----------------------|
| MANUELLA MENARD SANTISTEVAN,      | * | CIV 06-3002          |
|                                   | * |                      |
| Plaintiff,                        | * |                      |
|                                   | * | MEMORANDUM OPINION   |
| -vs-                              | * | AND ORDER            |
|                                   | * |                      |
| UNITED STATES OF AMERICA,         | * |                      |
|                                   | * |                      |
| Defendant.                        | * |                      |
|                                   | * |                      |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

This is an action brought under the Federal Tort Claims Act.

## FACTS

In 1990, while outside running, the plaintiff was hit by a motor vehicle. As a result of this collision, the plaintiff developed a bump, which was composed of a collection of fat cells, on her left leg near the lateral part of her upper thigh. Such a lump is commonly referred to as a lipoma.

On December 18, 2000, the plaintiff, accompanied by her then significant other, Aaron Santistevan, went to the Rosebud Indian Health Service Hospital (IHS) in Rosebud, South Dakota, and met with Dr. Romero Vivit ("Vivit"), an employee of IHS, to consult with him about having him remove the lipoma on her left leg to make it look symmetrical with her right leg. The plaintiff told IHS that the lipoma was painful, especially during the winter months, and that it often created discomfort when she would walk, run, or sit. At the consultation, Vivit drew a diagram for the plaintiff illustrating where the incision would be needed to effectively complete the surgery. This illustration indicated that the incision and corresponding lipoma removal would be in the lateral area of the plaintiff's left thigh, below the buttock. This would be the exact area where plaintiff sustained her injury in 1990.

On December 27, 2000, the plaintiff met with physicians' assistant Jayne Miller as part of a pre-operation evaluation. At this meeting, the plaintiff's surgery was scheduled for January

2, 2001. On January 2, 2001, the plaintiff and her then significant other arrived at IHS and the plaintiff was given a consent form to execute prior to her surgery. Plaintiff signed the consent form under the assumption that the surgery would be for removing the lipoma on the lateral part of her left thigh, below the buttock. The written consent form stated that Vivit would be excising a deformity in the left infra-gluteal region but did not specify whether it was on the medial or lateral part of the thigh. It is undisputed that a consent form written in language unfamiliar and foreign to a lay person does not constitute the required "informed" consent of the patient. Neither Vivit nor any other IHS employee marked - on the plaintiff - the area where the surgery was to be performed prior to the surgery. Additionally, no photos were ever taken of the plaintiff's leg by Vivit or any other IHS employee before, during, or after the surgery.

When the plaintiff was out of surgery, Vivit told the plaintiff that her surgery was a success and that he had removed the lump. The plaintiff's leg was heavily bandaged. She was unable to see the incision immediately after surgery. The next day, plaintiff's significant other was helping change the plaintiff's bandage, when both plaintiff and her significant other noticed that the incision was near her inner thigh (medial) and groin area, not the outer (lateral) thigh area, which plaintiff understood was to be the operative site. Moreover, the lipoma on the plaintiff's left lateral thigh was still present.

Plaintiff went back to IHS on January 3, 4, and 12, 2001, for follow-up visits and each time expressed concern that the lump she wanted Vivit to remove was still present. The plaintiff was referred to the IHS telemedicine department in order to discuss the possibility of plastic surgery for scar revision as a result of the scarring from the January 2, 2001, surgery. The plaintiff, however, never showed up for these appointments. She had lost all confidence in IHS care by that time.

In February of 2002, the plaintiff self-referred herself to Dr. Robert Schutz, a board-certified plastic and reconstructive surgeon from Rapid City, South Dakota to seek out his advice on what procedures could be done to correct the lipoma on the lateral part of her left thigh as well as minimize the scarring from her January 2, 2001, operation. IHS refused to refer the plaintiff to Dr. Schutz because IHS claimed to offer plastic surgery services on-site. Despite

seeing Dr. Schutz several times from 2002 to 2004, the plaintiff never had Schutz perform any surgeries on her.

In June 2006, plaintiff consulted Dr. Ben Lee, a board-certified plastic surgeon from Englewood, Colorado, about the lateral thigh lipoma and the inner thigh scar resulting from the January 2001 surgery. The plaintiff also consulted Lee about a breast augmentation procedure, which was unrelated to the plaintiff's January 2001 surgery. Lee recommended doing liposuction to even out the symmetry of her legs to correct the deformity resulting from her January 2001 surgery. In September 2006, Lee performed the leg and breast augmentation surgeries.

Plaintiff timely field an administrative federal tort claim in December 2002. Plaintiff exhausted her administrative remedies as required by the Federal Tort Claims Act and filed suit in United States District Court in January 2006.

## ANALYSIS

The United States may be found liable for certain tortious acts pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2674, a limited waiver of the government's sovereign immunity. In general, the law of the state where the accident occurred defines plaintiff's substantive tort rights under the FTCA. 28 U.S.C. § 1346(b). The substantive law of South Dakota governs this action because plaintiff's tort claim arises out of conduct which happened in South Dakota. Because plaintiff's claim is one for negligence, in order to recover, she must prove that the defendant owed her a duty, that such duty was breached, and, as a result of the breach, she has suffered damages.

The law requires, in the case of alleged medical negligence, at least as a general proposition, that the medical professional failed to meet the required standard of care. South Dakota has adopted pattern jury instructions and they are commonly used in cases in federal and state courts in South Dakota.

In 2004, pattern jury instruction 20-70-50, was reviewed by the pattern jury instruction committee of the State Bar of South Dakota. This instruction provides: "In performing professional services for a patient, a specialist in a particular field of medicine

3

has the duty to possess that degree of knowledge and skill ordinarily possessed by physicians of good standing engaged in the same field of specialization in the United States. A specialist also has the duty to use that care and skill ordinarily exercised under similar circumstances by physicians in good standing engaged in the same field of specialization in the United States and to be diligent in an effort to accomplish the purpose for which the physician is employed. A failure to perform any such duty is negligence."

The official comment to this instruction is: "Although the South Dakota Courts recognize this standard of care for specialists, *the locality rule may still apply to a general practitioner*. The cases noted and the Comments to Instructions 20-70-30 and 20-70-40 should be reviewed in that event." (emphasis supplied)

We know also that an expert opinion as to the standard of care is not required if lay persons are qualified to judge what happened and why. Plaintiff nevertheless presented the testimony of Dr. Lee and Dr. Schutz as to the required standards of care.

South Dakota has not made clear when a physician is to be considered a "specialist," but the following is instructive, "the question whether a physician or surgeon is a specialist, while one of fact, is primarily for his own determination, and if he holds himself out as such, he must bring to his patients that degree of skill which a specialist assumes to possess." 61 Am.Jur. 2d Physicians, Surgeons, Etc. §209.

No testimony or evidence was presented at trial that Vivit was or was not board-certified in a surgery speciality. However, this is not fatal to finding that Vivit is a specialist. Vivit testified that he completed surgery residencies at Grant Hospital of Chicago and the Edward Hines, Jr. VA Hospital. He also testified that he performed, on average, 20 lipoma surgeries a year.

Dr. Vivit clearly held himself out, generally and to the plaintiff, to be a specialist in performing lipoma surgeries. He clearly took the position that there was no need to refer the patient to a either a general surgeon or a plastic surgeon. In other words, he was a "sufficient" specialist to perform the surgery. I find, therefore, that there was sufficient evidence presented at trial to determine that Vivit would be considered a medical specialist

4

in the area of lipoma surgery, and Drs. Schutz and Lee were both qualified to testify as to the proper standard of care on a national level.

Dr. Schutz made it clear, in his testimony, that a lipoma removal procedure is a plastic surgery procedure that "crosses with" a general surgery procedure. We know also that, according to IHS, a plastic surgeon was available to do plastic surgery procedures at Rosebud. If Dr. Vivit was not in fact a specialist in performing lipoma surgeries and would not or could not be expected to conform to national standards, he had a legal duty to refer the patient to either a general surgeon or a plastic surgeon. He failed to do so.

South Dakota pattern jury instruction 20-70-40, an instruction that relies not on a decision by the South Dakota Supreme Court but on <u>Dewes v. Indian Health Service, Public Health Service</u>, 504 F. Supp. 203 (DSD 1980), speaks of the duty in South Dakota to refer to a specialist.

"It is the duty of a general practitioner to refer a patient to a specialist or recommend the assistance of a specialist if, under the circumstances, a reasonably careful and skillful general practitioner would do so. If the general practitioner fails to perform that duty and undertakes to or continues to perform professional services without the aid of a specialist, it is a further duty to exercise the care and skill ordinarily used by specialists in good standing in the same field of specialization in the United States and under similar circumstances. A failure to perform any such duty is negligence."

However, assuming, arguendo, that Vivit was not a specialist, but a generalist, and assuming further that non-specialists are not held to national standards in South Dakota, he would then be held to a similar locality standard of care. "In South Dakota, medical professionals are bound to possess and apply 'that degree of learning and skill ordinarily possessed by [medical professionals] of good standing engaged in the same type of practice in the same or similar locality.'" <u>In the Matter of Yemmanur</u>, 447 NW2d 525, 528 n. 3 (SD 1989).

Dr. Schutz is a surgeon who has practiced medicine as a plastic surgeon for 15 years in Rapid City - a city 200 miles away from the Rosebud IHS but still in South

5

Dakota. Therefore, assuming that Vivit is not a specialist, he had no duty to refer and was thus, subject to a same or similar locality standard of care, I find that Schutz is more than qualified to testify to the standard of care that surgeons in the same or similar locality must exhibit.

At trial, the government's expert, Dr. John Oliphant, testified that the standard of care is physician specific. This assertion is erroneous and contrary to law. What Dr. Vivit subjectively believed or how he performed his duties does not dictate whether he has met the standard of care in this case. The standard of care that Dr. Vivit owed to the plaintiff is objective in nature. Whether or not Dr. Vivit met this standard, therefore, is determined by looking at whether other doctors performing lipoma surgery would have treated the plaintiff the same way Vivit did.

One of the physician's duties in meeting the standard of care is to obtain the patient's informed consent to the procedure before the physician provides the treatment. What the informed consent must contain varies, of course, from treatment to treatment, but what must be disclosed are those factors that are material to the procedure so the patient may make an informed decision regarding whether or not to pursue the treatment. As the South Dakota Supreme Court has held, "[m]ateriality . . . is the cornerstone upon which the physician's duty to disclose is based." Wheeldon v. Madison 374 NW2d 367, 375 (S.D.1985). In Wheeldon, the Court also set forth the standard in determining what information is material.

> A risk is generally defined as material when a reasonable person, in what the physician knows or should know to be the patient's position, would be likely to attach significance to the risk or risks in deciding whether to submit to the proposed medical treatment or procedure." *Id.* (citing *Canterbury v. Spence*, 464 F.2d 772, 787 (D.C.Cir.1972)).

Here, Dr. Vivit drew a diagram for plaintiff illustrating where he intended to make an incision and where he intended to remove the lipoma. Dr. Vivit's illustration shows that he intended to make the incision on the lateral part of plaintiff's left thigh to remove a lipoma in that region. Where Vivit intended to operate and from what portion of plaintiff's

thigh he intended to remove the lipoma are obviously material issues to which plaintiff reasonably attached significance.

A question of fact exists in this case as to whether IHS personnel looked at the "area of complaint" before scheduling surgery. The pre-trial brief of defendant promised that IHS employee Jayne Miller would testify that plaintiff showed them the "area of complaint" in the same area where the surgery was performed. She gave no such testimony. By contrast, the plaintiff testified unequivocally that she showed both Dr. Vivit and Jayne Miller the bump on her thigh. I believe and accept such testimony of the plaintiff as a fact. After all, who would know better than the plaintiff what had been bothering her for years? Although there is nothing in the medical records of IHS showing a palpation of the lipoma, Dr. Vivit testified that he did palpate the site. If he did palpate the lipoma on plaintiff's first visit, he palpated the area of plaintiff's complaint, not the site of the surgery.

We also know that, almost immediately after the surgery, the plaintiff returned on three occasions to IHS to complain as to what had been done and what had not been done. Prompt and consistent complaints point to credibility. Plaintiff and her significant other were shocked when they first saw the results of the Vivit surgery and realized that he had operated at the wrong site. I believe such testimony. I also believe the testimony of the plaintiff that she was assured by IHS employees that they would obtain another medical doctor, presumably a plastic surgeon, to "fix" the problem. They attempted to convince the plaintiff to come to IHS to do exactly that and she refused to allow them a second chance. She had the legal right to decline further IHS treatment and surgery. Dr. Vivit had also assured the plaintiff that she would have a normal left side as compared to her right side and that did not occur.

There can be no doubt that this case is one where "a picture is worth a thousand words." As between the diagram that Vivit drew and the informed consent the plaintiff signed, Vivit should have been aware that, absent instructions to the contrary, the plaintiff would have attached more significance to the diagram. From the patient's perspective, the

diagram is easy to understand and specific with respect to where - medially or laterally - the incision would be made. The informed consent, by contrast, was extremely vague, in terms of where the incision would be made and was riddled with terms that would have required plaintiff to use a Stedman's Medical Dictionary in order to decipher.

The informed consent that plaintiff signed simply had her consenting to an "excision of lipomatous deformity left infra gluteal region." The consent also lacks specificity with respect to whether it was the medial or lateral side of plaintiff's left thigh on which Vivit intended to operate.

What Vivit ultimately did to was make the incision on the medial portion of the plaintiff's leg and remove fatty tissue from the medial part of the plaintiff's thigh. In other words, the incision was made on the opposite side of the leg that plaintiff thought would be operated on, and Vivit gave the plaintiff no notice that he would be operating on her medial side. It is untenable to claim that, since plaintiff consented to the removal of a lipoma from her left thigh and a lipoma was removed from her left thigh, "no harm, no foul."

Dr. Vivit was medically trained with extensive surgical experience. By contrast, the plaintiff was a high school graduate with some college education. Looking then, at the relative education and experiences of the parties, it was entirely reasonable for plaintiff to rely on the diagram that Vivit drew. If Vivit intended for his diagram to be illustrative only, he owed a duty to the plaintiff to make that clear. He did not.

It was also to be reasonably expected that Vivit would operate on the site shown to him by the patient and at no other site. Even if there was some conflict between the informed consent and the diagram that Vivit drew, this apparent conflict could have easily been resolved had Vivit or someone acting at his direction simply marked the plaintiff prior to her undergoing anesthesia before the surgery. He failed to do so.

Drs. Lee and Schutz both testified that it is the standard of care to have the patient marked - where the incision will be made - while the patient is standing prior to the patient undergoing anesthesia. Lee and Schutz testified that this is done because the appearance of landmarks can change depending on whether the patient is standing, sitting, or lying down.

I accept this as being the standard of care in all cases of lipoma surgery. In addition, as a practical matter, had Vivit or some other IHS employee marked the plaintiff prior to her undergoing general anesthesia, any incongruities between where plaintiff thought the incision would be made and where Vivit intended to make the incision would have been rectified prior to the surgery. Plaintiff would also have been asked to mark the site and no such request was made. I find that Dr. Vivit breached his duty of obtaining the plaintiff's informed consent prior to her surgery by failing to disclose, with any required specificity, where he intended to operate. Had Vivit done so, the plaintiff would have known that where Vivit intended to operate was not in the same location as his illustration and was not what she had demonstrated and requested.

This is clearly a wrong site surgery case. Whether what Vivit actually did was of some value to the plaintiff is entirely immaterial. No emergency of any kind was present. The plaintiff had made no complaint and had not requested any surgery in the area where the surgery was performed. It is her body, after all, and Vivit proceeded without any required consent.

It is of some significance that the expert witnesses for the plaintiff were not "hired guns." They were seeing the patient, examining her, listening to her medical history, and attempting to treat her. By contrast, the expert for the defendant has never talked to the plaintiff and has never examined her. He has never made any request to do so. It is common knowledge that the most important ingredient in treating a patient is the medical history given by the patient to the health care provider and the witness for the government had no such role. Such expert also provided no testimony about informed consent or the necessity therefor. His standard of care, as already discussed, was neither a national nor a same or similar locality standard. It was the subjective standard based upon what Dr. Vivit thought was appropriate. As a matter of law, this so-called standard of care must be rejected. He did reject the speculation by Dr. Vivit that the first surgery actually made the lipoma on the lateral part of plaintiff's left thigh larger.

I accept the testimony of the experts for plaintiff. These include the opinions that this was indeed a wrong site surgery, that there was no informed consent, that the Vivit surgery was a failure, that Vivit or someone under his direction should have marked the patient when she was standing erect, that certainly any marking should not be done while the patient was sedated (although no marking was done at any time), that Dr. Vivit should not have caused a major scar on the patient's medial thigh or inner thigh, and that Dr. Vivit failed to meet any required standard of care.

Having listened to the testimony and having observed the witnesses, I find that the expert witnesses for the plaintiff were more credible than the expert witness for the defendant. I find that the expert witness for the defendant engaged in gross speculation not based upon reasonable medical probability or certainty. His attempts to explain away the pictures taken of plaintiff's leg soon after the surgery and what the plaintiff observed of her own body are rejected as lacking in common sense and credibility. The pictures show, without a doubt, as did the testimony of the plaintiff, that this indeed is a wrong site surgery case. The expert witness for the defendant saw his role as too much of an advocate, rather than a disinterested medical expert. This was in sharp contrast to the testimony and demeanor of the expert witnesses for the plaintiff.

I do not, of course, level accusations of bad faith or any other improper motive. All expert witnesses were well intentioned and in good faith. We know that a jury can reject the testimony and opinions of any witness, even an expert witness. A trial judge can do likewise and I have done so.

Next, in order for plaintiff to be successful on her cause of action, it is fundamental that she prove that she also suffered damages as a result of Vivit's breach of duty. Under South Dakota law, plaintiff must prove two additional elements in order to be successful on her claim. First, plaintiff must "also demonstrate that the undisclosed risk manifested itself, causing the complained-of injury." Wheeldon at 376. Here, it is clear that an undisclosed material risk occurred and caused injury to the patient. The plaintiff expected to have an incision made on the lateral portion of her left thigh for the removal of a lipoma

10

therein. What she received was an incision on the medial side of her left thigh and had tissue removed from her medial thigh while the lipoma as to which she sought Vivit's help in removing remained. The medial thigh incision and resulting scar line are hardly *de minimis*, and I find that plaintiff has met her burden in proving damages.

Secondly, the plaintiff must prove that, if the undisclosed risk had been disclosed, "a reasonable person in [plaintiff's] position 'would not have agreed to the proposed treatment if adequately apprised beforehand of the material risk which resulted in [the] injury.'" Savold v. Johnson, 443 NW2d 656, 659 (S.D. 1989) (citing Wheeldon at 376). Here, too, I find that plaintiff has met her burden. Had Vivit disclosed to plaintiff the possibility that he would have instead performed the surgery on her medial thigh, it is quite likely that a reasonable person in plaintiff's position would not have agreed to the proposed treatment. As a result of Vivit's treatment, plaintiff now has, or at least had, a scar in her groin area that is visible every time she looks at that area. Vivit's drawing indicated that the incision, and therefore, by necessity, the resulting scar line, would have been below her buttock, thus only visible if plaintiff was looking at her thigh from behind.

In addition to the scar, which was readily visible to the plaintiff anytime she looked at her groin area, the plaintiff also testified that the scar was also extremely noticeable to others, which made sexual intercourse more difficult because of its close proximity to her vaginal area. I find these facts sufficient to determine that, had risks like this been disclosed to the plaintiff prior to her surgery, a reasonable person in the plaintiff's position would not have agreed to the proposed surgery. Plaintiff, therefore, has proved by a preponderance of the evidence that she suffered injuries as a result of Vivit's breach of duty.

Having found the United States liable for Vivit's malpractice, the Court must determine what, if any, damages plaintiff suffered. A District Court has broad discretion in fixing damages in a FTCA case. Jackson v. United States, 750 F.2d 55, 56 (8th Cir. 1984); Occhino v. United States, 686 F.2d 1302 (8th Cir. 1982). However, only compensatory

damages are awarded under the Federal Tort Claims Act. Occhino v. United States, 686 F.2d at 1306; 28 U.S.C. § 2674.

Additionally, the FTCA provides that the United States is liable "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. §2674. Under the FTCA, then, the United States will be held liable to the same extent as a private party would.

There is no doubt that this plaintiff has suffered hardships in her life since her surgery. However, I am not convinced that all of these hardships are a result of her January 2001 surgery. Plaintiff testified that she lost her marriage over this operation. I find such testimony to not be sufficiently credible or reliable. Plaintiff's relationship with Aaron Santistevan was rocky at best. Plaintiff started dating her husband, Aaron, in 1995. Plaintiff testified that, from 1996 to 1999, Aaron was out of the house. In 2004, the plaintiff and Aaron had a child, and in 2005, the plaintiff and Aaron were married. I do not find that the surgery in 2001 drove the plaintiff and Aaron apart, especially in light of the fact that four years *after* plaintiff's surgery, the two were married. It was brought to my attention at trial that plaintiff's husband recently plead guilty, in front of Chief Judge Schreier, to conspiracy to distribute a controlled substance, a crime for which he has been sentenced to 30 months imprisonment. At trial, plaintiff also testified that she recently filed for a divorce from her husband. Thus, there is no question that plaintiff's marriage has been lost, but I am not convinced that the erosion of her marriage is the proximate result of her surgery with Dr. Vivit.

Next, plaintiff seeks damages for negligent infliction of emotional distress. South Dakota recognizes the tort of negligent infliction of emotional distress ("NIED"). *See* Wright v. Coca Cola Bottling Co., 414 NW2d 608 (S.D. 1987). Any recovery, however, must be based on the manifestation of physical symptoms. *See* First National Bank v. Drier, 1998 SD 1, ¶12, 574 NW2d 597, 600. The physical symptoms, in turn, must be casually connected to the emotional distress. *See* Nelson v. WEB Water Development

Ass'n, Inc., 507 NW2d 691, 699 (S.D. 1993). As the South Dakota Supreme Court has explained, the "physical consequences" requirement is based on at least three primary concerns:

> (1) the problem of permitting legal redress for harm that is often temporary and relatively trivial; (2) the danger that claims of mental harm will be falsified or imagined; and (3) the perceived unfairness of imposing heavy and disproportionate financial burdens on a defendant who was only negligent, for consequences which appear remote from the "wrongful" act.

Brown v. Youth Services Intern. of South Dakota, Inc., 89 F.Supp.2d 1095, 1104 (D.S.D. 2000) (*citing* Wright, 414 NW2d at 610) (*quoting* Prosser & Keeton on the Law of Torts, § 54 at 360 (5th ed. 1988))). Here, however, the plaintiff failed to provide evidence that she suffered a physical manifestation of her emotional distress, which is critical for her to be entitled to recovery under this theory. Plaintiff testified that she became depressed and her brother and husband both testified that she became withdrawn, distant, and moody following her January 2001 surgery, but there was no testimony that plaintiff suffered a *physical* manifestation of her symptoms as a result of her emotional distress. Therefore, plaintiff cannot recover damages for NIED.

Plaintiff did pay Dr. Lee $4,421 for his services in at least partially correcting Dr. Vivit's surgery. However, of the $4,421 plaintiff paid, $3,250 was for the plaintiff's breast augmentation surgery, a cost wholly unrelated to her January 2001 surgery. She cannot, therefore, recover the $3,250 she paid for the breast augmentation surgery.

Plaintiff, in her testimony, did not complain to the effect that the 1990 injury has yet to be corrected. She did not exhibit her thigh during the trial. Nothing in the medical records of Dr. Lee indicates that he did remove the lipoma on plaintiff's left thigh. Dr. Oliphant expressed his opinion that no medical doctor has corrected the original problem. He may very well be correct but I am uncertain as to the question of whether the lipoma on the left lateral thigh has yet been removed. If it has not been "solved," the plaintiff should

have said so in her testimony. She is apparently content and satisfied with what Dr. Lee did to help her.

It is clear that plaintiff has suffered pain, disfigurement, loss of enjoyment of life, and was exposed to the risks of having to endure another surgery with all of its associated risks as a result of Dr. Vivit's negligence. The court will award plaintiff $20,000 to compensate her for her damages.

There is no implication of bad faith or intentional misconduct by Dr. Vivit. He has performed and continues to perform valuable services for Native American people and I commend him for that. He simply made mistakes in this case, to the detriment of the plaintiff.

The plaintiff has met her burden of proof by a preponderance of the evidence and the defendant is liable to the plaintiff as explained above. The foregoing constitutes the Court's findings of facts and conclusions of law as required by Fed. R. Civ. P. 52(a).

ORDER

Based upon the foregoing findings of facts and conclusions of law, judgment shall be entered by the Clerk in favor of the plaintiff with taxable costs.

Dated this 31st day of March, 2009

BY THE COURT:

*/s/ Charles B. Kornmann*
CHARLES B. KORNMANN
UNITED STATES DISTRICT JUDGE

ATTEST:

JOSEPH HAAS, CLERK

BY:_____
    DEPUTY   (SEAL)